No. 14-14239-QQ[*]

UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

---

METROPCS COMMUNICATIONS, INC. and
METROPCS FLORIDA, LLC,

Appellants,

vs.

JORGE PORTER,

Appellee.

---

From the July 11, 2014, Order of the United States District Court for the
Southern District of Florida in Case No. 13-23745 (Judge Lenard)

---

## CORRECTED PRINCIPAL BRIEF OF APPELLANTS

---

Michael J. Stortz
Drinker Biddle & Reath LLP
50 Fremont St., 20th Floor
San Francisco, CA 94105-2235

Michael P. Daly
Drinker Biddle & Reath LLP
One Logan Square, Suite 2000
Philadelphia, PA  19103-6996

Aaron S. Weiss (FBN 48813)
Carlton Fields Jorden Burt P.A.
100 S.E. Second Street, Suite 4200
Miami, Florida  33131-2114

James B. Baldinger (FBN 869899)
Carlton Fields Jorden Burt P.A.
525 Okeechobee Boulevard, Suite 1200
West Palm Beach, FL 33401-6350

*Attorneys For Appellants MetroPCS
Communications, Inc. and  MetroPCS Florida, LLC*

---

[*] The Appellants' brief was inadvertently initially filed on September 29, 2014 in Case No. 14-90015-QQ, which is the Court's docket for the petition for permission to appeal.  Pursuant to instructions from the Clerk, this brief is being refiled in Case No. 14-14239-QQ.  This Corrected Brief is being submitted to address a minor formatting error with the submission.

## CERTIFICATE OF INTERESTED PARTIES

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1 – 26.1-3, Appellants certify that the following persons and entities may have an interest in the outcome of this proceeding:

1.   Baldinger, James B. (attorney for MetroPCS defendants)

2.   CAI International, Inc. (defendant)

3.   Carlton Fields Jorden Burt P.A. (attorneys for MetroPCS defendants)

4.   Cueto, Jorge (judge of the Circuit Court in and for the Eleventh Judicial Circuit, Miami-Dade County, Florida)

5.   Daly, Michael P. (attorney for MetroPCS defendants)

6.   Dorta, Gonzalo R. (attorney for Plaintiff)

7.   Dorta, Matias R. (attorney for Plaintiff)

8.   Drinker Biddle & Reath LLP (attorneys for MetroPCS defendants)

9.   Fente, Manuel F. (attorney for CAI International, Inc.)

10.   Gonzalo R. Dorta, P.A. (attorneys for Plaintiff)

11.   Law Offices of Manuel F. Fente, P.A. (attorneys for CAI Int'l, Inc.)

12.   Lenard, Joan A. (U.S. District Judge)

13.   Luck, David L. (attorney for MetroPCS defendants)

14. MetroPCS Communications, Inc. (former NYSE ticker symbol: PCS), n/k/a T-Mobile US, Inc. (defendant)

15. MetroPCS Florida, LLC (defendant).

16. O'Sullivan, John J. (U.S. Magistrate Judge)

17. Porter, Jorge (Plaintiff)

18. Slawe, Meredith C. (attorney for MetroPCS defendants)

19. Stortz, Michael J. (attorney for MetroPCS defendants)

20. T-Mobile US, Inc. (NYSE ticker symbol:  TMUS) (corporate parent of MetroPCS defendants)

21. Weiss, Aaron S. (attorney for MetroPCS defendants)

 /s/ *Aaron S. Weiss*
Aaron S. Weiss

# <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1 – 26.1-3, Appellants state as follows:

On April 30, 2013, MetroPCS Communications, Inc. (former NYSE ticker symbol: PCS), a Delaware corporation, consummated a business combination transaction (the "Transaction") pursuant to an agreement with T-Mobile USA, Inc., a Delaware corporation, T-Mobile Global Holding GmbH ("Holding"), a *Gesellschaft mit beschränkter Haftung* organized and existing under the laws of the Federal Republic of Germany, T-Mobile Global Zwischenholding GmbH ("Global"), a *Gesellschaft mit beschränkter Haftung* organized and existing under the laws of the Federal Republic of Germany, and Deutsche Telekom AG ("Deutsche Telekom"), an *Aktiengesellschaft* organized and existing under the laws of the Federal Republic of Germany. MetroPCS Communications, Inc. was renamed T-Mobile US, Inc. and remains a publicly-traded company (NYSE ticker symbol: TMUS). MetroPCS Wireless, Inc. was merged with and into T-Mobile USA, Inc., which became a wholly owned subsidiary of T-Mobile US, Inc. Holding owns more than 10% of the shares of T-Mobile US, Inc. Holding is a direct, wholly-owned subsidiary of Global, which is a direct, wholly-owned subsidiary of Deutsche Telekom. The principal trading market for Deutsche Telekom's ordinary shares is the Frankfurt Stock Exchange (ticker symbol: DTE).

Deutsche Telekom's ordinary shares also trade on the Berlin, Düsseldorf, Hamburg, Hannover, München and Stuttgart stock exchanges in Germany. Deutsche Telekom's American Depositary Shares ("ADSs"), each representing one ordinary share, trade on the OTC market's highest tier, OTCQX International Premier (ticker symbol: DTEGY).

*/s/ Aaron S. Weiss*
Aaron S. Weiss

## STATEMENT REGARDING ORAL ARGUMENT

Appellants do not request oral argument because the Court has limited time within which to render judgment and can conclude from the briefing alone that reversal is required.

# TABLE OF CONTENTS

**Page**

TABLE OF CITATIONS ........................................................................ iii

STATEMENT OF JURISDICTION ..................................................... 1

STATEMENT OF THE ISSUE ............................................................ 3

STATEMENT OF THE CASE ............................................................. 4

I.      Statement of the Proceedings and Disposition Below ................................. 4

II.     Statement of the Facts ............................................................ 4

      A.     The Complaint and First Amended Complaint ................................ 4

      B.     The Motion to Compel Arbitration ................................. 5

      C.     The Second Amended Complaint ..................................... 6

      D.     The Notice of Removal ................................. 9

      E.     The Motion to Remand ................................. 10

STANDARD OF REVIEW ................................................................. 12

SUMMARY OF THE ARGUMENT .................................................. 13

ARGUMENT ...................................................................................... 14

I.      The Decision Below Conflicts With Clear Controlling Authority ............... 14

II.     The Decision Below Conflicts With CAFA's Purpose and History ............ 25

CONCLUSION ................................................................................... 30

CERTIFICATE OF COMPLIANCE ................................................. 31

CERTIFICATE OF SERVICE ........................................................... 32

# TABLE OF CITATIONS

**Page(s)**

C<small>ASES</small>

*Brill v. Countrywide Home Loans, Inc.*,
   427 F.3d 446 (7th Cir. 2005) ............................................................ 18, 19, 25

*Bryan v. Wal-Mart Stores, Inc.*,
   No. 08-5221, 2009 WL 440485 (N.D. Cal. Feb. 23, 2009) ................................22

*Calkins v. Google, Inc.*,
   No. 13-00760, 2013 WL 3556042 (N.D. Cal. July 12, 2013) ...........................21

*Coleman v. Estes Express Lines, Inc.*,
   730 F. Supp. 2d 1141 (C.D. Cal. 2010), *aff'd*, 631 F.3d 1010
   (9th Cir. 2011) ...............................................................................................21

*Cuadras v. MetroPCS Wireless, Inc.*,
   No. 09-7897, 2011 WL 11077125 (C.D. Cal. Aug. 8, 2011) ...........................10

*Frederick v. Hartford Underwriters Ins. Co.*,
   683 F.3d 1242 (10th Cir. 2012) .....................................................................21

*Helm v. Alderwoods Grp., Inc.*,
   No. 08-01184, 2008 WL 2002511 (N.D. Cal. May 7, 2008) ...........................21

*Johns-Manville Sales Corp. v. Mitchell Enters., Inc.*,
   417 F.2d 129 (5th Cir. 1969) ..........................................................................15

*Lewis v. Verizon Commc'ns, Inc.*,
   627 F.3d 395 (9th Cir. 2010) ............................................................ 20, 21, 25

*Little v. T-Mobile USA, Inc.*,
   691 F.3d 1302 (11th Cir. 2012) ......................................................................27

*Lowery v. Ala. Power Co.*,
   483 F.3d 1184 (11th Cir. 2007) ......................................................................26

*Margulis v. Resort Rental, LLC*,
   No. 08-1719, 2008 WL 2775494 (D. N.J. July 14, 2008) ................................22

*McDaniel v. Fifth Third Bank*,
  568 F. App'x 729 (11th Cir. 2014) ..................................................... 17, 18, 25

*McPhail v. Deere & Co.*,
  529 F.3d 947 (10th Cir. 2008) .......................................................................21

*Miedema v. Maytag Corp.*,
  450 F.3d 1322 (11th Cir. 2006) ................................................................ 17, 25

*Muniz v. Pilot Travel Ctrs. LLC*,
  No. 07-0325 FCD EFB, 2007 WL 1302504 (E.D. Cal. May 1, 2007) .............21

*Pretka v. Kolter City Plaza II, Inc.*,
  608 F.3d 744 (11th Cir. 2010) .................................................................. 12, 15

*Raskas v. Johnson & Johnson*,
  719 F.3d 884 (8th Cir. 2013) ................................................................ 19, 20, 25

*S. Fla. Wellness, Inc. v. Allstate Ins. Co.*,
  745 F.3d 1312 (11th Cir. 2014) ............................................................ 16, 17, 25

*Schunk v. Moline, Milburn & Stoddard Co.*,
  147 U.S. 500 (1893) .......................................................................................14

*Smithers v. Smith*,
  204 U.S. 632 (1907) .......................................................................................14

*Spivey v. Vertrue, Inc.*,
  528 F.3d 982 (7th Cir. 2008) ................................................................... 20, 25

*Standard Fire Ins. Co v. Knowles*,
  --- U.S. ----, 133 S. Ct. 1345 (2013) ............................................................26

*Transamerica Leasing, Inc. v. Inst. of London Underwriters*,
  430 F.3d 1326 (11th Cir. 2005) ....................................................................28

*Vega v. T-Mobile USA, Inc.*,
  564 F.3d 1256 (11th Cir. 2009) .............................................................. 15, 27

*Venner v. Great N. Ry. Co.*,
  209 U.S. 24 (1908) .........................................................................................14

*Walewski v. Zenimax Media, Inc.*,
  502 F. App'x 857 (11th Cir. 2012) .................................................27

*White v. Playphone, Inc.*,
  No. 08-683, 2009 WL 499103 (W.D. Wis. Feb. 27, 2009) ...............22

*Zumerling v. Devine*,
  769 F.2d 745 (Fed. Cir. 1985) ........................................................21

## STATUTES, RULES & REGULATIONS

28 U.S.C. § 1332 .........................................................................1, 15

28 U.S.C. § 1453 ................................................................................1

Fed. R. Civ. P. 8 ...............................................................................24

Fed. R. Civ. P. 23 .............................................................................24

## LEGISLATIVE AUTHORITIES

151 Cong. Rec. S1076-01 (daily ed. Feb. 8, 2005) .............................27

Class Action Fairness Act of 2005 (CAFA), Pub. L. No. 109-2, 119 Stat. 4 §
  2(a)(2) ..........................................................................................26

Remarks on Signing the Class Action Fairness Act of 2005, 41 *Weekly*
  *Comp. Pres. Doc.* 265 (Feb. 18, 2005) ..........................................27

S. Rep. No. 109-14 (1st Sess. 2005) .................................................26

## OTHER AUTHORITIES

Manual for Complex Litigation § 21.222 (4th ed. 2004) .....................24

# STATEMENT OF JURISDICTION

Jurisdiction exists under 28 U.S.C. §§ 1332(d), 1453(b) and 1453(c)(1), which were parts of the Class Action Fairness Act of 2005 (CAFA), Pub. L. No. 109-2, 119 Stat. 4 (codified in scattered sections of Title 28).

The lower court had subject matter jurisdiction pursuant to Section 1332(d), which states that "[t]he district courts shall have original jurisdiction of any civil action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a class action in which . . . any member of a class of plaintiffs is a citizen of a State different from any defendant," and had removal jurisdiction pursuant to Section 1453(b), which states that "[a] class action may be removed to a district court of the United States in accordance with section 1446 (except that the 1-year limitation under section 1446(c)(1) shall not apply), without regard to whether any defendant is a citizen of the State in which the action is brought, except that such action may be removed by any defendant without the consent of all defendants."  28 U.S.C. §§ 1332(d)(2)(A), 1453(b). Section 1446 in turn sets forth the procedural requirements for notices of removal, all of which were satisfied here.

This Court has appellate jurisdiction pursuant to Section 1453(c)(1), which states that "a court of appeals may accept an appeal from an order of a district court granting or denying a motion to remand a class action to the State court from

which it was removed if application is made to the court of appeals not more than 10 days after entry of the order." Appellants timely filed a Petition for Permission to Appeal on July 21, 2014, which was "not more than 10 days after entry" of the district court's remand order on July 11, 2014. This Court granted that Petition on September 19, 2014, thereby giving rise to jurisdiction under Section 1453(c)(1).

## STATEMENT OF THE ISSUE

Whether the district court erred in finding that MetroPCS did not satisfy CAFA's amount in controversy requirement because it did not concede that it had defrauded people and quantify the number of people it had allegedly defrauded.

## STATEMENT OF THE CASE

### I.      Statement of the Proceedings and Disposition Below

Plaintiff Jorge Porter ("Plaintiff") filed suit in Florida state court.  He filed

his Complaint on May 1, 2012 and First Amended Complaint on August 16, 2012.

(DE 1-3 at 9, 109).  The state court granted him leave to file a Second Amended

Complaint on September 20, 2013.  (DE 1-3 at 207).  MetroPCS Communications,

Inc. and MetroPCS Florida, LLC (collectively "MetroPCS") filed a Notice of

Removal on October 15, 2013.  (DE 1-1).  The Notice of Removal explained that

the new pleading asserted new claims on behalf of a new class that put more than

$5 million in controversy for the first time.  *See id.*  Plaintiff filed a Motion to

Remand on October 28, 2013.  (DE 7).  The district court granted that Motion on

July 11, 2014.  (DE 70).  MetroPCS timely filed a Petition for Permission to

Appeal on 21, 2014.  This Court granted that Petition on September 19, 2014.

### II.     Statement of the Facts

#### A.      The Complaint and First Amended Complaint

Plaintiff commenced this action in the Circuit Court of the Eleventh Judicial

District in and for Miami-Dade County, Florida.  He filed his Complaint on May 1,

2012, and First Amended Complaint on August 16, 2012.[1]  (DE 1-3 at 9, 109).

---

[1]  The First Amended Complaint changed "Cell Access Cellular, Inc." to "CAI International, Inc. f/k/a Cell Access Cellular, Inc." and added certain claims against MetroPCS.  (DE 1-3 at 9, 109).

Both pleadings alleged that CAI International, Inc. ("CAI"), an authorized MetroPCS retailer, had charged excessive sales tax when it sold Samsung Galaxy Indulge phones for use with MetroPCS service. Specifically, Plaintiff alleged that the local 7% sales tax had been based on phones' pre-rebate price of $299.99 rather than their post-rebate price of $199.99, meaning that CAI had allegedly "overcharged the Class $7.00 per Phone sold to each Class member." First Am. Compl. ¶ 36 (DE 1-3 at 114). Plaintiff defined a putative class as follows:

> [A]ll persons who . . . (a) purchased from Seller a Samsung Galaxy Indulge cellular phone . . ., (b) were charged $299.99, (c) received a $100.00 instant rebate, and (d) were charged sales tax on the full (not discounted) $299.99 amount . . . .

*Id.* ¶ 1 (DE 1-3 at 109). He postulated that the putative class ranged from 2,500 to 10,000 people, *id.* ¶ 13 (DE 1-3 at 111), meaning that he believed that the amount in controversy ranged from $17,500 to $70,000.[2]

### B. The Motion to Compel Arbitration

On June 11, 2012, MetroPCS filed a Motion to Compel Arbitration pursuant to the MetroPCS Terms and Conditions of Service ("Terms and Conditions"). Plaintiff opposed that Motion by arguing that he had never received a copy of the Terms and Conditions—notwithstanding the fact that he had purchased seven

---

[2] That turned out to be optimistic, however. CAI's records confirmed that the putative class defined in those pleadings could consist of no more than 755 people, meaning that amount placed in controversy by that claim was no more than $5,285. Opp'n to Mot. to Remand, Ex. A ¶¶ 9, 17 (DE 21-1 at 2-3).

different phones at seven different times.  He agreed, however, that "if he had received the Terms when he purchased the phone, then he would be bound by the Terms by using the services under known Terms."  *See, e.g.*, Pl.'s Answer Br. of Mar. 1, 2013 at 10 (DE 4-5 at 11).

Despite evidence that was incontrovertible—and in at least one important respect uncontroverted—the trial court denied the Motion to Compel Arbitration without holding a hearing or writing an opinion.[3]  Order of Oct. 22, 2012 (DE 1-3 at 144).  After MetroPCS took an interlocutory appeal, the Third District Court of Appeal reversed and remanded with instructions that the trial court determine whether the parties had formed a contract.  Order of May 15, 2013 (DE 1-3 at 161). The trial court scheduled a hearing for September 20, 2013.  *See* Notice of Hearing (DE 1-3 at 188).

### C.    The Second Amended Complaint

One week before the hearing on whether Plaintiff had received a copy of the Terms and Conditions, Plaintiff moved for leave to file an amended pleading that alleged for the first time that he had been fraudulently induced into accepting it.

---

[3]    That evidence included testimony from MetroPCS employees who described how Plaintiff would have received several hard copies of the Terms and Conditions and how he received numerous text messages that directed him to the MetroPCS website where he could review the Terms and Conditions online at his leisure. It also included testimony from a CAI employee who handled one of Plaintiff's purchases and testified that he routinely followed a standard practice of providing the Terms and Conditions and other documents to customers.  Finally, it included Plaintiff's own testimony that he had no memory of that transaction and that the documents "might have been in that bag when they gave it to me."  *See generally* Mot. to Compel dated Oct. 22, 2013 (DE 4 at 4).

The gist of that new claim is that using the ubiquitous phrase "no contract" to describe service that has no annual commitment and no early termination fee led him to believe that his service was not governed by any terms and conditions. *See* Sec. Am. Compl. ¶ 34 (DE 1-3 at 199) (alleging that "no contract" terminology is "fraudulent and misleading" and "designed and intended for obtaining money . . . for its products and services under false pretenses . . . .").

The Second Amended Complaint asserts that new claim on behalf of a new "Contract Class." Under the heading "**Definition of the Class**," it defines that new class as follows:

> [C]onsumers who became and/or continued to be METROPCS subscribers under the understanding that except for monthly payment for the wireless services that are [sic] no agreements, contracts and/or contractual "terms and conditions" regulating the customer or membership relationship between METROPCS and Florida subscribers/users of METROPCS wireless services, during the period of time METROPCS disseminated or caused to be advertised or marketed its products and services under a "no contract" or "no agreement" basis. This loss [sic] of consumers are [sic] referred to as "Contract Class," and represents the second set of consumers that Porter represents.

*Id.* ¶ 1 (DE 1-3 at 192-93) (typography in original). Then, under the headings "**Common Facts For Each Class**" and "<u>**CONTRACT CLASS: SHARE THE FOLLOWING COMMON FACTS**</u>," it alleges that every subscriber believed that there were no Terms and Conditions:

> Every subscriber or member of METROPCS [is] under the impression and understanding that there were no contracts, agreements or

contractual terms and conditions governing their METROPCS wireless services and products and remained under that understanding and/or impression until the earlier of termination of services, METROPCS and/or enforced any claim or rights against the consumer arising from METROPCS or "terms and conditions."

*Id.* at 2 ¶ a (DE 1-3 at 193) (typography in original); *see also id.* ¶ 3 (DE 1-3 at 195) ("Defendants . . . have acted materially the same as to each" class member); *id.* ¶ 20 (DE 1-3 at 197-98) (describing "false advertisement in a misleading manner to the general public of this State by false advertisement"); *id.* ¶ 53 (DE 1-3 at 202) ("METROPCS caused to publicly disseminate in form of marketing and advertising false and misleading advertisement."); *id.* ¶ 54 ("MetroPCS intended and in fact did publicly circulate this false advertisement to obtain money and customers and in fact did so obtain said benefits by publicly creating this false impression of its products and services."). In the Prayer for Relief, it seeks monetary damages for both common law fraud and violation of FDUTPA. *See id.*, Count IV, Prayer for Relief (c) (fraud); *id.*, Count V, Prayer for Relief (FDUTPA) (DE 1-3 at 203). In short, it alleges that every MetroPCS subscriber in Florida was led to believe that there are no Terms and Conditions, that no subscriber in Florida would have paid for MetroPCS services and products had they known otherwise, and that every subscriber in Florida is now demanding restitution of all of the monies they paid.

MetroPCS asked the court to deny the Motion for Leave without prejudice so that the scope of Plaintiff's individual claims could be decided by an arbitrator. During the first day of the hearing on September 20, 2013, however, the court granted the Motion for Leave and issued an order to that effect the same day. *See* Order dated Sep. 20, 2013 (DE 1-3 at 207).[4]

### D.    The Notice of Removal

MetroPCS timely filed a Notice of Removal on October 15, 2013.  (DE 1). The Notice of Removal explained that the Second Amended Complaint turned an action on behalf of a few hundred people seeking a few thousand dollars into an action on behalf of several million people seeking several millions of dollars. MetroPCS supported its Notice of Removal with the Declaration of Jerry Rausch, its Vice President of Finance.  Mr. Rausch's Declaration explained that the new "Contract Class" included millions of Florida subscribers and that during the class period MetroPCS had never collected less than $5 million per month from them. *See* Rausch Decl. ¶ 11 (DE 1-2 at 2) ("Since September 20, 2009, MetroPCS has never had fewer than one million subscribers in Florida."); *id.* ¶ 13 (DE 1-2 at 3) ("Since September 20, 2009, MetroPCS has never collected less than $5,000,000 per month for its various products and services in Florida.").  Indeed, in light of the

---

[4]    The state court scheduled a second day of the hearing for October 21, 2013, which was after the thirty day window for removal would have closed.  MetroPCS thus had no choice but to remove this action and then renew its Motion to Compel Arbitration in federal court.

class period (48 months) and minimum monthly revenue in Florida ($5,000,000), the amount placed in controversy had ballooned to at least $240,000,000.

### E.   **The Motion to Remand**

Plaintiff filed a Motion for Remand and Costs on October 28, 2013.  (DE 7). Among other things, Plaintiff argued that MetroPCS had not satisfied its burden of proof because it offered no evidence of how many subscribers it had defrauded. MetroPCS responded by explaining that there was no such evidence, as reasonable people could not be misled by the ubiquitous terminology "no contract" service,[5] and that in any event it was not obliged to stipulate to liability in order to invoke federal jurisdiction.  *See* Notice of Removal at 6 n.3 (DE 1 at 6); Opp'n to Mot. to Remand at 10 & n.12 (DE 21 at 15).

The district court granted the Motion to Remand on July 11, 2014.  (DE 70). The sole basis for its decision is that it believed that MetroPCS's evidence is

---

[5]      As it happens, the Third District Court of Appeal said as much during the course of this action.  *See* Tr. of Third DCA Argument at 26 (DE 1-3 at 152) ("JUDGE SCHWARTZ: In this field we all know, if I go to buy an AT&T . . . or some competitor and one of them has a no contract and the other has a contract, the other contract -- You see this on television every day. There is no contract involved in this case. You are not bound for a year. And the advertisement says, if you have a contract, you are going to get -- even if it's a lower rate, you are going to wind up paying much more than any other thing because you have agreed to be bound for an extended period of time.").  That is quite right; the phrase "no contract" has long been used to distinguish postpaid services (which require long commitments and early termination fees) from prepaid services (which do not).  In other words, it is simply a shorthand that means customers can cancel service at any time without notice or penalty.  That usage is well-known to carriers, trade associations, journalists, consumer advocates, and consumers.  *See, e.g., Cuadras v. MetroPCS Wireless, Inc.,* No. 09-7897, 2011 WL 11077125, at *9 (C.D. Cal. Aug. 8, 2011) ("The Court is not persuaded . . . that the T&Cs cannot be a contract because MetroPCS advertises that it is a 'no contract' wireless service provider.").

overinclusive because it is based on all Florida subscribers rather than those who had "actual[ly]" been misled. *See id.* at 6 ("Defendants have not provided any evidence demonstrating the actual size of the Contract Class."). In other words, it found that MetroPCS could not remove this action unless it not only conceded that it had defrauded people but also quantified the people it had allegedly defrauded. *See id.* ("[T]he Court is left to speculate as to the size of the Contract Class and, ultimately, the amount of damages that the Contract Class has put at issue."). MetroPCS then petitioned for and received permission to take this appeal.

## STANDARD OF REVIEW

A decision to remand for lack of federal jurisdiction is reviewed *de novo*.

*See, e.g.*, *Pretka v. Kolter City Plaza II, Inc.*, 608 F.3d 744, 751 (11th Cir. 2010).

# SUMMARY OF THE ARGUMENT

This Court should reverse the district court's remand order because it imposes a burden that is unwarranted and unworkable. For more than a century it has been settled that courts may not reach the merits of a claim when they assess federal jurisdiction, and that defendants need not concede the merits of a claim when they invoke it. A contrary rule would force defendants to choose between Scylla and Charybdis: either remove an action and forgo the right to defend it, or defend an action and forgo the right to remove it. By forcing MetroPCS to make that choice, the district court ignored a long line of cases from the Supreme Court, this Court, and seemingly every other court of appeal that has reached this issue.

The district court's remand order also conflicts with the purpose of CAFA, which was to expand jurisdiction and ease removal. Forcing defendants to identify the consumers that they injured is particularly problematic in class actions not only because the stakes are immense but also because the class members are unknown. Indeed, two common objections to class certification are that class members are not ascertainable and that their damages are not calculable on a classwide basis. The district court's order has the perverse result of encouraging plaintiffs to define classes that are unascertainable and discouraging defendants from exercising their right to remove cases of interstate importance. Nothing in CAFA's text compels such a result and everything in its legislative history counsels against it.

## ARGUMENT

## I.  The Decision Below Conflicts With Clear Controlling Authority

More than 100 years ago, the Supreme Court confirmed that whether a plaintiff is likely to succeed on the merits is irrelevant to whether a federal court has jurisdiction to reach the merits.  Indeed that is true even if a "perfect defence" is apparent from the facts alleged.  As the Court explained:

> Although there might be a perfect defence to the suit for at least the amount not yet due, yet the fact of a defence, and a good defence, too, would not affect the question as to what was the amount in dispute. Suppose an action were brought on a non-negotiable note for $2500, the consideration for which was fully stated in the petition, and which was a sale of lottery tickets, or any other matter distinctly prohibited by statute, can there be a doubt that the Circuit Court would have jurisdiction? There would be presented a claim to recover the $2500; and whether that claim was sustainable or not, that would be the real sum in dispute. In short, the fact of a valid defence to a cause of action, although apparent on the face of the petition, does not diminish the amount that is claimed, nor determine what is the matter in dispute; for who can say in advance that that defence will be presented by the defendant, or, if presented sustained by the court?

*Schunk v. Moline, Milburn & Stoddard Co.*, 147 U.S. 500, 504-05 (1893).  So long as a claim is not "evidently fictitious," its merit is irrelevant.  *Id.* at 505; *see also Smithers v. Smith*, 204 U.S. 632, 642 (1907) (finding that jurisdiction exists unless "it is not legally possible for him to recover the jurisdictional amount," even if "a perfect defense might be interposed to a sufficient amount of the claim to reduce it below the jurisdictional amount"); *Venner v. Great N. Ry. Co.*, 209 U.S. 24, 34 (1908) ("It may undoubtedly be shown in defense that plaintiff has no right under

the allegations of this bill or the facts of the case to bring suit, but that is no defect of jurisdiction"); *Johns-Manville Sales Corp. v. Mitchell Enters., Inc.*, 417 F.2d 129, 131 (5th Cir. 1969) ("'[C]ourts should be careful not to decide the merits, under the guise of determining jurisdiction, without ordinary incidents of a trial.'") (citation omitted).

That rule applies with equal if not greater force in putative class actions. *See Pretka*, 608 F.3d at 751 (explaining in removed class action that "the pertinent question is what is *in controversy* in the case, not how much the plaintiffs are ultimately likely to recover" (citations omitted) (internal quotations omitted)). *Cf. Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1268 n.12 (11th Cir. 2009) ("plaintiff's failure to make a showing of numerosity . . . does not divest the federal courts of subject matter jurisdiction under the CAFA" because "jurisdictional facts are assessed at the time of removal"). That makes sense. After all, if courts cannot decline jurisdiction based on perfect defenses to the claims of named plaintiffs whose experiences are alleged, it stands to reason that they cannot decline jurisdiction based on **possible** defenses to the claims of **unnamed** plaintiffs whose experiences are **not** alleged. If for example Plaintiff asserted an individual claim that was worth more than $75,000, he could not avoid jurisdiction under Section 1332(a) by arguing that MetroPCS did not prove that his claim had merit. How, then, can he avoid jurisdiction under Section 1332(d) by

arguing that it did not prove that the claims of tens of thousands of unnamed class members had merit?  And yet that is just what was allowed to happen here.

That decision conflicts with clear and controlling authority from this Court. For example, the plaintiff in *South Florida Wellness, Inc. v. Allstate Insurance Co.*, 745 F.3d 1312 (11th Cir. 2014) filed a putative class action on behalf of healthcare providers that had received less than 80% of the amount they had billed for treatments.  The plaintiff claimed that the defendant could not pay less than that unless the defendant "clearly and unambiguously" disclosed as much in its policies, and sought a declaration that it had not done so.  The defendant removed and offered evidence that the difference between 80% of the amounts billed and 80% of the amounts paid was more than $68 million.  The district court remanded the action because it believed that evidence was speculative.  This Court reversed and explained that the amount in controversy analysis "is less a prediction of how much the plaintiffs are ultimately likely to recover, than it is an estimate of how much will be put at issue during the litigation."  *Id.* at 1315 (citations omitted). It then approved basing the amount in controversy on "[t]he maximum difference in the amount of payments that rides on the outcome of the declaratory judgment" even though some insureds may not have valid claims, for example if a treatment had been unnecessary, unreasonably expensive, or unrelated to an accident.  *Id.* at

1317. Those, the Court concluded, were merits issues that could not affect what was "in controversy" at the time of removal. *Id.*

Similarly, the plaintiff in *Miedema v. Maytag Corp.*, 450 F.3d 1322 (11th Cir. 2006), alleged that ovens were defective. The defendant removed and calculated the amount in controversy based on evidence that 6,729 ovens had been sold in Florida. The plaintiff moved to remand and argued that the affidavit was overinclusive because it did not exclude ovens that did not have the alleged defect. The district court agreed, finding that "[t]he affidavit . . . fails to confirm that each of the 6,729 units had the defective motorized door latch assembly." *Id.* at 1331. Although this Court affirmed for other reasons, it categorically rejected the notion that the defendant should have tried to quantify the number of ovens that were actually defective. *See id.* at 1331 ("[T]he district court should not have faulted Maytag for 'fail[ing] to confirm that each of the 6,729 units had the defective motorized door latch assembly.'"); *id.* at 1332 n.9 ("When determining the amount in controversy for jurisdictional purposes, however, courts cannot look past the complaint to the merits of a defense that has not yet been established.").

Most recently, the plaintiff in *McDaniel v. Fifth Third Bank*, 568 F. App'x 729 (11th Cir. 2014) (per curiam), challenged the defendant's practice of charging non-account holders a $4.00 check-cashing fee. The defendant removed and calculated the amount in controversy based on the total fees charged. The district

court remanded because it believed that certain claims were "deficient on their face." *Id.* at 730. This Court reversed because "courts should only consider the amount the plaintiff has placed in controversy, not the amount the plaintiff is likely to recover." *Id.* It explained as follows:

> [T]he district court's decision was based on the premise that the amount of damages flowing from facially deficient claims should not be considered when determining the amount in controversy. Were this correct, district courts would be required to consider the merits of a plaintiff's claims before deciding whether jurisdiction exists.
>
> There is no doubt that, when analyzing the amount in controversy, the district court is precluded from inquiring into the amount a party is likely to receive on the merits.... While a court may decide that some of a plaintiff's claims lack merit in the context of a motion to dismiss, such considerations are inappropriate as part of a jurisdictional analysis. Thus, the district court erred when it refused to consider the amount of damages flowing from McDaniel's fraud claims based on its determination that those claims failed as a matter of law.

*Id.* at 730-31 (internal citations omitted). This Court then approved calculating the amount in controversy by using the "entire amount of the checkcashing fees collected." *Id.* at 731. "Any inquiry into whether [plaintiff] would actually recover these amounts is unnecessary and inappropriate," it explained. *Id.*

This Court's decisions are in line with those of other courts of appeal across the country. For example, the plaintiffs in *Brill v. Countrywide Home Loans, Inc.*, 427 F.3d 446 (7th Cir. 2005) asserted Telephone Consumer Protection Act claims arising from the transmission of allegedly unsolicited facsimile advertisements. The defendant removed the action and offered evidence that it had sent at least

3,800 faxes, which would resulted in potential classwide damages ranging from $1.9 million (if violations were negligent) to $5.7 million (if violations were willful). The district court remanded because it believed that the plaintiff might be unable to prove willfulness, which would result in a verdict less than $5 million. The Seventh Circuit reversed. Judge Easterbrook explained that defendants need not "confess liability in order to show that the controversy exceeds the threshold" and that this defendant "did all that is necessary by admitting that one of its employees sent at least 3,800 fax ads." *See id.* at 449. He explained as follows:

> The district judge thought that a removing litigant must produce "evidence . . . that a favorable judgment will award Plaintiff" more than the jurisdictional minimum . . . . Yet suits are removed on the pleadings, long before "evidence" or "proof" have been adduced. The question is not what damages the plaintiff will recover, but what amount is "in controversy" between the parties. That the plaintiff may fail in its proof, and the judgment be less than the threshold (indeed, a good chance that the plaintiff will fail and the judgment will be zero) does not prevent removal. Once the proponent of jurisdiction has set out the amount in controversy, only a "legal certainty" that the judgment will be less forecloses federal jurisdiction.

*Id.* at 448.

In *Raskas v. Johnson & Johnson*, 719 F.3d 884 (8th Cir. 2013), the plaintiffs alleged that the defendants misstated the expiration dates on medications, causing consumers to discard and replace them prematurely. The defendants removed and calculated the amount in controversy based on overall sales figures. The plaintiff moved to remand because that evidence was not restricted to the value of the

medications that consumers had actually discarded and replaced prematurely. The district court agreed and remanded. Citing this Court's decision in *Pretka*, the Eighth Circuit reversed. It explained as follows:

> Other circuits have rejected similar overinclusive arguments . . . . Defendants are not required to provide a "formula or methodology for calculating the potential damages" more accurately, as the district court held. We have specifically rejected the need for this kind of formula or methodology, as it would require a defendant to 'confess liability' for the entire jurisdictional amount.

*Id.* at 887-88 (citations omitted).

Similarly, in *Spivey v. Vertrue, Inc.*, 528 F.3d 982 (7th Cir. 2008) the plaintiff alleged that the defendant made unauthorized charges to credit cards. The defendant removed because its total charges in Illinois came to almost $7 million. The plaintiff moved to remand and argued that the jurisdictional evidence was overinclusive because it included both authorized and unauthorized charges. The district court remanded. The Seventh Circuit reversed and stated as follows:

> The district judge thought this insufficient because Vertrue did not concede that more than $5 million in charges was unauthorized. Yet the statute does not make federal jurisdiction depend on how much the plaintiff is sure to recover . . . . Spivey's allegations thus put into 'controversy' the propriety of all of Vertrue's charges, and the complaint demands refunds for all unauthorized charges.

*Id.* at 985-86.

And in *Lewis v. Verizon Communications, Inc.*, 627 F.3d 395 (9th Cir. 2010), the plaintiff alleged that Verizon had billed some customers for premium

content without their authorization. Verizon removed based on an affidavit that showed the total amount billed for the category of services at issue. The plaintiff argued that the affidavit was overinclusive because some of the amounts billed were actually "authorized" and thus beyond the scope of the claim she was asserting. *Id.* at 399. The district court agreed because the class definition was limited to people who had unauthorized charges. The Ninth Circuit reversed and explained as follows:

> [O]n this record, the entire amount of the billings is "in controversy."
> The amount in controversy is simply an estimate of the total amount
> in dispute, not a prospective assessment of defendant's liability . . . .
> To establish the jurisdictional amount, Verizon need not concede
> liability for the entire amount, which is what the district court was in
> essence demanding by effectively asking Verizon to admit that at least
> $5 million of the billings were "unauthorized" within the meaning of
> the complaint.

*Id.* at 400.[6]

---

[6]     *See also Frederick v. Hartford Underwriters Ins. Co.*, 683 F.3d 1242, 1248 n.4 (10th Cir. 2012) (cautioning courts not "to improperly look beyond jurisdictional matters and consider the merits of the claims"); *McPhail v. Deere & Co.*, 529 F.3d 947, 956 (10th Cir. 2008) ("The amount in controversy is not proof of the amount the plaintiff will recover. Rather, it is an estimate of the amount that will be put at issue in the course of the litigation.") (individual action); *Zumerling v. Devine*, 769 F.2d 745, 748 (Fed. Cir. 1985) ("The amount in controversy for jurisdictional purposes must be ascertained by the requests in the pleadings without consideration of success on the merits.") (individual action); *Coleman v. Estes Express Lines, Inc.*, 730 F. Supp. 2d 1141, 1149 (C.D. Cal. 2010) (calculating amount in controversy based on 100% violation rate), *aff'd*, 631 F.3d 1010 (9th Cir. 2011); *Calkins v. Google, Inc.*, No. 13-00760, 2013 WL 3556042, at *2-3 (N.D. Cal. July 12, 2013) (holding that defendant satisfied its burden by providing number of calls rather than number of calls that were unauthorized); *Helm v. Alderwoods Grp., Inc.*, No. 08-01184, 2008 WL 2002511, at *5 (N.D. Cal. May 7, 2008) ("[D]efendants cannot be expected to try the case themselves for purposes of establishing jurisdiction, and then admit . . . that a certain number of . . . violations did indeed occur."); *Muniz v. Pilot Travel Ctrs. LLC*, No. 07-0325 FCD EFB, 2007 WL 1302504, at *2, *4 (E.D. Cal. May 1, 2007) (recognizing that defendant need

When viewed against this backdrop, the error below could not be clearer.

Under the heading "**Definition of the Class**," the Second Amended Complaint defines a class of subscribers who were "under the understanding that except for monthly payment for the wireless services that are no agreements, contracts and/or contractual 'terms and conditions' regulating the customer or membership relationship between METROPCS and Florida subscribers . . . ." Sec. Am. Compl. ¶ 1 (DE 1-3 at 192-93) (typography in original). Then, under the headings "**Common Facts For Each Class**" and "<u>**CONTRACT CLASS: SHARE THE FOLLOWING COMMON FACTS**</u>," it alleges that every single subscriber was under that impression:

> Every subscriber or member of METROPCS [is] under the impression and understanding that there were no contracts, agreements or contractual terms and conditions governing their METROPCS wireless services and products and remained under that understanding and/or impression until the earlier of termination of services, METROPCS and/or enforced any claim or rights against the consumer arising from METROPCS or "terms and conditions."

---

not "prove the plaintiff's claims" and assuming 100% violation rate); *Bryan v. Wal-Mart Stores, Inc.*, No. 08-5221, 2009 WL 440485, at *3 (N.D. Cal. Feb. 23, 2009) (rejecting "unworkable" request that defendant "conduct a fact-specific inquiry into whether the rights of each and every potential class member were violated"); *White v. Playphone, Inc.*, No. 08-683, 2009 WL 499103, at *4 (W.D. Wis. Feb. 27, 2009) ("[T]he complaint puts into controversy the propriety of all of defendants' charges."); *Margulis v. Resort Rental, LLC*, No. 08-1719, 2008 WL 2775494, at *5 (D. N.J. July 14, 2008) ("To require defendant to provide further information, e.g., whether the calls were placed to individuals who provided consent or were engaged in a business relationship, would require defendant to concede aspects of the claim against it . . . . Under plaintiff's argument, defendant would be required to concede that it actually violated the TCPA in order to remove the case, which would prove plaintiff's case and leave this Court the task of simply assessing damages. This is not proper.").

*Id.* at 2 ¶ a (DE 1-3 at 193) (typography in original); *see also id.* ¶ 3 (DE 1-3 at 195) ("Defendants opposing the Class have acted materially the same as to each" class member.); *id.* ¶ 20 (DE 1-3 at 197-98) (describing "the false advertisement in a misleading manner to the general public of this State by false advertisement"); *id.* ¶ 53 (DE 1-3 at 202) ("At all times, relevant, METROPCS caused to publicly disseminate in form of marketing and advertising false and misleading advertisement."). Fairly read, these allegations affirmatively place every subscriber's experience and payments in controversy.

The district court disagreed. It believed that MetroPCS had tried to "rewrite" the Second Amended Complaint by correcting a typographical error —specifically by supplying the omitted word "is"—in the block quote above. Order at 5 n.1 (DE 70). It concluded that Plaintiff had not alleged that every customer had been misled, and as a result MetroPCS needed to quantify customers who had been misled if it wanted to remove the case to federal court.

That was wrong for two reasons. First, that simply misreads the pleading. Given that the class is already defined in paragraph 1, and the language on page 2 appears under the headings "**Common Facts For Each Class**" and "**CONTRACT CLASS: SHARE THE FOLLOWING COMMON FACTS**," the only reasonable reading is that this is an attempt to allege facts supporting commonality and typicality, rather than an attempt to restate or refine the prior class definition.

The allegations on page 2 would serve no purpose and make no sense otherwise. The district court's reading ignores that the Second Amended Complaint is riddled with similar scriveners' errors,[7] and invites gamesmanship based on such errors. *See, e.g.*, Fed. R. Civ. P. 8(e) ("Pleadings must be construed so as to do justice."). MetroPCS's reading on the other hand makes abundant sense.

Second, whether Plaintiff successfully or even intentionally alleged that everyone in the putative class was misled is not relevant, much less controlling. As the authorities above make clear, it makes no difference whether Plaintiff meant to define an overbroad class (only some members of which have viable claims) or a fail-safe class (any member of which has a viable claim).[8] Putting aside whether plaintiffs should define such classes at all,[9] the "overinclusiveness" argument in

---

[7]    The class definition itself is evidence enough of that. Sec. Am. Compl. ¶ 1 (DE 1-3 at 192-93) ("[C]onsumers who became and/or continued to be METROPCS subscribers under the understanding that except for monthly payment for the wireless services that are [sic] no agreements, contracts and/or contractual 'terms and conditions' regulating the customer or membership relationship between METROPCS and Florida subscribers/users of METROPCS wireless services, during the period of time METROPCS disseminated or caused to be advertised or marketed its products and services under a 'no contract' or 'no agreement' basis. This loss [sic] of consumers are [sic] referred to as 'Contract Class,' and represents the second set of consumers that Porter represents.").

[8]    Class definitions are "fail-safe" when they turn on the merits of the claims. They are called that because putative class members would never be bound by an adverse judgment: either their claims are proven on the merits (in which case they are members of the class and enjoy the benefits of the judgment) or disproven (in which case they are not members of the class and are not bound by the judgment). In either case, they are a no-lose proposition for plaintiffs that violate the 1966 amendments to Rule 23, which rejected the practice of "one-way intervention" and required that judgments be binding "[w]hether or not favorable to the class." Fed. R. Civ. P. 23(c)(3); *see also* Manual for Complex Litigation § 21.222 (4th ed. 2004) ("The order defining the class should avoid . . . terms that depend on resolution of the merits (e.g., persons who were discriminated against).").

[9]    *See infra* section II.

either scenario is essentially the same: that a defendant cannot remove unless it admits liability to either some or all of a class. Plaintiffs cannot require that defendants do that in order to remove a class action, or any action for that matter. *See South Florida Wellness*, 745 F.3d at 1315-17; *Miedema*, 450 F.3d at 1331; *McDaniel*, 568 F. App'x at 730-31; *see also, e.g.*, *Brill*, 427 F.3d at 448; *Raskas*, 719 F.3d at 887-88; *Spivey*, 528 F.3d at 985-86; *Lewis*, 627 F.3d at 400. Yet that is precisely what happened here.

As Plaintiff did not plead an amount in controversy, MetroPCS simply needed to show by a preponderance of the evidence that the amount in controversy exceeds $5 million. It did so with competent evidence that was tailored to the claims asserted. *See supra*. Plaintiff was thus obliged to show to a "legal certainty" that it was impossible for him to recover more than that amount. He did not do so. It follows that the district court should have denied his Motion to Remand and that its order granting that Motion should be reversed.

## II.    The Decision Below Conflicts With CAFA's Purpose and History

The decision below conflicts not only with this Court's precedent but also with CAFA's purpose and legislative history. Indeed it makes a mockery of CAFA by encouraging gamesmanship by plaintiffs and discouraging removal by defendants, which of course is the polar opposite of what CAFA was meant to do.

CAFA was meant to "address inequitable state court treatment of class actions and to put an end to certain abusive practices by plaintiffs' class counsel" by "broadening federal diversity jurisdiction over class actions with interstate implications." *Lowery v. Ala. Power Co.*, 483 F.3d 1184, 1193 (11th Cir. 2007); *id.* at 1197 (discussing "intent that CAFA be used to provide for more uniform federal disposition of class actions affecting interstate commerce."); *see also Standard Fire Ins. Co v. Knowles*, --- U.S. ----, 133 S. Ct. 1345, 1350 (2013) (explaining that allowing plaintiffs to use nonbinding stipulations to evade CAFA would "squarely conflict with the statute's objective").

CAFA was a response to "abuses of the class action device" that had benefitted lawyers to the detriment of "class members with legitimate claims" and "defendants that have acted responsibly." CAFA § 2(a)(2). A prime example of that was that plaintiffs would commonly "game the system" by manipulating pleadings to defeat diversity. S. Rep. No. 109-14, at 5, 10 (1st Sess. 2005). Congress addressed these problems by "plac[ing] the determination of more interstate class action lawsuits in the proper forum—the federal courts." *Id.* at 5; *see also id.* at 27 ("the federal courts are the appropriate forum to decide most interstate class actions"); *id.* at 53 ("class actions are precisely the kind of cases that should be heard in federal court"); *id.* ("large interstate class actions belong in federal court"); *id.* at 61 ("[f]ederal courts are the appropriate forum to decide

interstate class actions"). That intention was expressed by the legislators who supported the statute[10] and by the President who signed it into law.[11]

Everything in the legislative history confirms that CAFA was meant to discourage plaintiffs from forum shopping and encourage defendants to remove. The district court's remand order in this action does just the opposite, however. If its reasoning becomes the order of the day, a plaintiff could evade CAFA simply by defining an inappropriate class such as "everyone who was defrauded" or "everyone who did not consent." *See Little v. T-Mobile USA, Inc.*, 691 F.3d 1302, 1304 (11th Cir. 2012) ("Before a district court may grant a motion for class certification, a plaintiff . . . must establish that the proposed class is adequately defined and clearly ascertainable." (citations omitted)); *Walewski v. Zenimax Media, Inc.*, 502 F. App'x 857, 861 (11th Cir. 2012) ("the district court did not abuse its discretion by concluding that the class was not adequately defined or clearly ascertainable"). That would turn CAFA on its head: the less appropriate the class definition, the less likely it would be that a federal court would review it. *Cf. Vega*, 564 F.3d at 1268 n.12 (finding that denial of certification does not divest

---

[10]    *See, e.g.*, 151 Cong. Rec. S1076-01, 1076 (daily ed. Feb. 8, 2005) (statement of Sen. Specter) ("[T]here is . . . a very important purpose here: to put cases in the Federal court to avoid forum shopping and judge shopping.").

[11]    *See* Remarks on Signing the Class Action Fairness Act of 2005, 41 *Weekly Comp. Pres. Doc.* 265, 266 (Feb. 18, 2005) ("[CAFA] moves most large, interstate class actions into Federal courts. This will prevent trial lawyers from shopping around for friendly local venues.").

court of CAFA jurisdiction). In short, the district court's reasoning encourages the sort of jurisdictional gaming that CAFA was meant to discourage.

The district court's reasoning also discourages defendants from exercising the removal right that CAFA was meant to encourage. How could a defendant go about proving—by a preponderance of the evidence—which customers had been defrauded or had not consented such that their claims may be included in the jurisdictional calculus? Could it ascertain who is and isn't a member of the class? Could it send surveys to millions of customers? Could it receive and analyze responses within 30 days? And would that be any different from the individualized inquiries that make many putative class actions inappropriate in the first place?

And even if a defendant could do those things, no rational defendant would. The process required by the district court would be tantamount to a stipulation that class members are ascertainable, have viable claims, and have damages that are calculable on a classwide basis—things that defendants vigorously dispute in class actions like this one. What defendant would be willing to remove if it meant stipulating to those things and running the risk that it would be forever estopped from disputing them? *Cf. Transamerica Leasing, Inc. v. Inst. of London Underwriters*, 430 F.3d 1326, 1335 (11th Cir. 2005) (discussing judicial estoppel).

In short, the district court's order puts defendants in an untenable position: either remove an action and forego the right to defend it, or defend an action and forego the right to remove it.  That is not—and cannot be—the law.

## CONCLUSION

For the foregoing reasons, MetroPCS respectfully requests that this Court reverse the Order below and remand with instructions for further proceedings.

Respectfully submitted,

By  /s/ Aaron S. Weiss

Michael J. Stortz
Drinker Biddle & Reath LLP
50 Fremont St., 20th Floor
San Francisco, CA 94105-2235
Telephone: (415) 591-7583
Facsimile: (415) 591-7510
E-mail:  michael.stortz@dbr.com

Michael P. Daly
Drinker Biddle & Reath LLP
One Logan Square, Suite 2000
Philadelphia, PA 19103-6996
Telephone: (215) 988-2700
Facsimile: (215) 988-2757
E-mail:  michael.daly@dbr.com

Aaron S. Weiss (FBN 48813)
Carlton Fields Jorden Burt P.A.
100 S.E. Second Street, Suite 4200
Miami, Florida 33131-2114
Telephone: (305) 539-7382
Facsimile: (305) 530-0055
E-mail:  aweiss@carltonfields.com

James B. Baldinger (FBN 869899)
Carlton Fields Jorden Burt P.A.
525 Okeechobee Boulevard, Suite 1200
West Palm Beach, FL 33401-6350
Telephone: (561) 650-8026
Facsimile: (561) 659-7368
E-mail:  jbaldinger@carltonfields.com

*Attorneys for Appellants*

## <u>CERTIFICATE OF COMPLIANCE</u>

I certify that the foregoing document complies with: the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) and Eleventh Circuit Rule 28-1, the type-face requirements of Fed. R. App. P. 32(a)(5), and the type-style requirements of Fed. R. App. P. 32(a)(6). I further certify that the foregoing document was prepared in proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman.


  /s/ *Aaron S. Weiss*
Aaron S. Weiss

## CERTIFICATE OF SERVICE

I certify that, on this 30th day of September, 2014, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I further certify that the foregoing document is being served on this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing

/s/ *Aaron S. Weiss*
Aaron S. Weiss

Gonzalo R. Dorta
Mathias Dorta
Gonzalo R. Dorta, P.A.
334 Minorca Avenue
Coral Gables, Florida 33134

*Counsel for Plaintiff/ Appellee Jorge Porter*

Manuel Fente
Law Offices of Manuel F. Fente, P.A.
1110 Brickell Avenue, 7th Floor
Miami, Florida  33131

*Counsel for Defendant CAI, Inc.*